485 S.E.2d 119

**Rebekah WOOTEN, a minor by her Guardian Ad Litem Margaret WOOTEN, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION f/k/a South Carolina Department of Highways and Public Transportation, Appellant.**

**Margaret WOOTEN, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION f/k/a South Carolina Department of Highways and Public Transportation, Appellant.**

No. 2654.

Court of Appeals of South Carolina.

Heard Feb. 4, 1997.

Decided April 7, 1997.

Rehearing Denied May 22, 1997.

518

Charles E. Carpenter, Jr., and Deborah Harrison Sheffield, both of Richardson, Plowden, Carpenter & Robinson, Columbia; and William Jeff Weston and Merl F. Code, both of Code & Weston, Greenville, for appellant.

W. Harold Christian, Jr., of Christian & Davis, Greenville, for respondents.

CONNOR, Judge:

The jury awarded Rebekah Wooten and her mother, Margaret Wooten, verdicts stemming from an accident in which Rebekah was struck by an automobile. South Carolina Department of Transportation (SCDOT) appeals the denial of its post-trial motions. We affirm.

## Facts

Normally twelve-year-old Rebekah Wooten, a student at Greer Middle School, rode the bus home from school. On February 10, 1992, she decided to walk because she had gone to discuss a grade with one of her teachers after school and had missed the bus. As she attempted to cross the intersection of Wade Hampton Boulevard and Memorial Drive, she was struck by a car.

Although the record does not contain the date the intersection was initially constructed, traffic signals were added in 1979. The day of the accident, the signals were designed to allow a continuous green light on Wade Hampton unless loop sensors detected vehicles on the cross street, Memorial Drive. When a vehicle triggered the loop sensors, the light changed to allow traffic on Memorial Drive to cross the intersection. The time for the cross traffic was extended for each vehicle the sensors detected. The minimum time for the green light for Memorial Drive was eight seconds, with four seconds

added as additional cars crossed the sensors up to a maximum of twenty-five seconds.

Wade Hampton Boulevard was seven lanes wide and 112 feet across where the accident occurred. SCDOT standards assume a normal walking speed of four feet per second. Thus a minimum of twenty-eight seconds would have been required to cross the intersection.

In February 1991, the school flashers were not working properly at the intersection of Wade Hampton and Forest Street, approximately 800 feet away from the Memorial Drive intersection. The department decided to remove the flashers at Forest Street because the driver of an approaching vehicle could not adequately see an oncoming vehicle. SCDOT contemplated making the intersection of Wade Hampton and Memorial a possible alternative student route. However, the principal at Greer Middle School indicated he did not want students crossing Wade Hampton at all. Therefore, SCDOT decided not to make any changes to the Memorial Drive intersection.

Rebekah's school was located in the northwest quadrant of the intersection. Rebekah was proceeding across an unmarked crosswalk facing a green light. She made it to a concrete median, where she paused because the light changed colors. At that point, there were cars in the two northbound lanes closest to her. These cars stopped to allow her to finish crossing the street. Unfortunately, the driver of the car in the far northbound lane could not see Rebekah, and struck her as she attempted to get across.

Rebekah's injuries required her to miss a year of school, caused permanent facial disfigurement, and changed her vision. Additionally, she now has other physical and mental limitations.

### Procedure

Rebekah's mother, Margaret Wooten, filed one complaint as Rebekah's guardian, and a second complaint for Rebekah's medical expenses. The complaints initially named the SCDOT (formerly known as the South Carolina Department of Highways and Public Transportation), the City of Greer, the

Greenville County School District, and Joyce Henderson as defendants.

Henderson settled with the Wootens, paying each $6,250. The Greenville County School District also settled, giving $9,000 to Rebekah and $1,000 to her mother. The actions against SCDOT and Greer were consolidated for trial. At trial, after Wooten had completed her case, she voluntarily dismissed the City of Greer, leaving only SCDOT as a defendant. The jury awarded Rebekah $315,000 and her mother $135,000.

SCDOT filed a series of post-trial motions. The trial court granted a setoff for the settlement amounts Henderson and the school had paid. He denied the other motions. SCDOT appeals the denial of its motions for judgment notwithstanding the verdict, and for new trial or, alternatively, remittitur of the verdict to $250,000 under the South Carolina Tort Claims Act.

## Scope of Review

A negligence action is legal in nature. *Mortgage Loan Co. v. Townsend,* 156 S.C. 203, 152 S.E. 878 (1930). In an action at law tried by a jury, our jurisdiction extends merely to correction of errors of law. *Townes Assocs., Ltd. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976). We will not disturb the jury's factual findings unless a review of the record discloses there is no evidence which reasonably supports the findings. *Id.* In ruling on motions for directed verdict and JNOV, we must view the evidence and the inferences that can reasonably be drawn therefrom in the light most favorable to the nonmoving party. *Strange v. S.C. Dep't of Highways & Pub. Transp.,* 314 S.C. 427, 445 S.E.2d 439 (1994). If the evidence yields more than one inference, we must deny the motions. *Id.*

## Analysis

The South Carolina Tort Claims Act waives sovereign immunity for torts committed by the State of South Carolina, its political subdivisions, and governmental employees acting within the scope of their official duties. S.C.Code Ann. § 15–78–10 through 15–78–190 (Supp.1996). The Act lists numerous exceptions to the waiver of immunity. S.C.Code Ann.

§ 15–78–60. The governmental entity asserting a limitation upon liability, or an exception to the waiver of immunity under the Torts Claims Act, must prove the exception or limitation as an affirmative defense. *Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 445 S.E.2d 439 (1994).

SCDOT argues it has design and discretionary immunity. S.C.Code Ann. 15–78–60(15). The code exempts governmental entities from liability for certain situations. It excludes governmental responsibility for the following:

Nothing in this item gives rise to liability arising from a failure of any governmental entity to initially place any of the above signs, signals, warning devices, guardrails, or median barriers when the failure is the result of a discretionary act of the governmental entity.

The signs, signals, warning devices, guardrails, or median barriers referred to in this item are those used in connection with hazards normally connected with the use of public ways and do not apply to the duty to warn of special conditions such as excavations, dredging, or public way construction.

Governmental entities are not liable for the design of highways and other public ways.

*Id.* (paragraph structure added).

## A. Design Immunity

SCDOT first argues it is not liable because the Tort Claims Act provides immunity for design defects. S.C.Code Ann. § 15–78–60(15) (Supp.1996).

 Statutes waiving sovereign immunity must be strictly construed. *Truesdale v. South Carolina Highway Dep't*, 264 S.C. 221, 213 S.E.2d 740 (1975). However, all rules of statutory construction must yield to the principle that courts should endeavor to ascertain the real intention of the legislature. *Horn v. Davis Electrical Constructors, Inc.*, 307 S.C. 559, 416 S.E.2d 634 (1992). When interpreting a statute, legislative intent must prevail if it can be reasonably discovered in the language used, which must be construed in light of the intended purpose of the statute. *Gambrell v. Travelers Ins. Cos.*, 280 S.C. 69, 310 S.E.2d 814 (1983). In construing a

statute, its words must be given their plain and ordinary meaning. *Id.* Keeping these principles in mind, we must first analyze the statute.

Although the statute clearly retains sovereign immunity for highway design, it does not define design.[1] However, some courts have held:

> [A] statute may provide that neither a public entity nor a public employee is liable for an injury that was caused by the plan or design of a construction of, or improvement to, public property where such plan or design was approved in advance of the construction or improvement by either the legislative body of the public entity or by some other body or employee exercising discretionary authority to give such approval, or where such plan or design was prepared in conformity with standards previously so approved, if the court determines that there is any substantial evidence on the basis of which (1) a reasonable public employee could have adopted the plan or design, or the standards therefor, or (2) a reasonable legislative body, or other body or employee, could have approved the plan or design, or the standards therefor.

57 Am.Jur.2d § 333 (1988); *see, e.g., State v. Webster,* 88 Nev. 690, 504 P.2d 1316 (1972) (discretionary immunity did not shield negligence of governmental entity in failing to install cattle guard at freeway entrance where motorist was killed when his car crashed into a horse that was wandering at night).

■ Discretionary immunity is not, however, perpetual. 57 Am.Jur.2d § 335. If the governmental entity has actual or constructive notice the original plan or design has changed, producing a dangerous condition, the entity will not be shielded from a failure to take corrective action. *Id.; accord, Baldwin v. State,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 154–55, 491

---

1. Black's defines design as:

> To form plan or scheme of, conceive and arrange in mind, originate mentally, plan out, contrive. Also, the plan or scheme conceived in mind and intended for subsequent execution; preliminary conception of idea to be carried into effect by action; contrivance in accordance with preconceived plan. A project, an idea. As a term of art, the giving of a visible form to the conceptions of the mind, or invention.

Black's Law Dictionary 447 (6th ed. 1990).

P.2d 1121, 1130–31 (1972) (although mere passage of time is not sufficient to constitute a change in conditions, where the "actual operation under changed physical conditions produces a dangerous condition ... and causes injury" the governmental entity does not retain immunity it once had).

■ The rationale behind statutory design immunity is to avoid a jury reweighing the same factors which were already considered by the governmental entity that approved the design. *Cameron v. State*, 7 Cal.3d 318, 102 Cal.Rptr. 305, 497 P.2d 777 (1972).

Immunity is not available where there is evidence a governmental entity "had actual knowledge of the use by young children of the thing designed and of the fact that such use rendered the property and its maintenance extremely dangerous," particularly if there is no substantial evidence demonstrating the reasonableness of the design. 57 Am.Jur.2d § 335; *see also, Gorman v. Adams*, 259 Iowa 75, 143 N.W.2d 648, 652 (1966) (" 'tort liability may arise if the municipal corporation negligently fails to perform its governmental duty and dangerous conditions result which cause injury to one properly availing himself of the tendered service' ") (citation omitted); *Fraley v. City of Flint*, 54 Mich.App. 570, 221 N.W.2d 394 (1974) (sovereign immunity does not shield governmental entity where flagrant design defect in timing of traffic control signal existed even though timing was within parameters established by state procedures manual); *Delosovic v. City of New York*, 143 Misc.2d 801, 541 N.Y.S.2d 685 (N.Y.Sup.Ct.1989) (once walk/don't walk signals are installed, the governmental entity has a duty to see they perform properly and give a pedestrian walking at an average rate of speed enough time to cross).

The Tort Claims Act extends to acts of omission as well as commission. *Cf.* S.C.Code Ann. § 15–78–60(20) (Supp.1996) ("The governmental entity is not liable for a loss resulting from ... an act or omission of a person other than an employee including but not limited to the criminal actions of third persons."); *see also Fraley v. Flint*, 54 Mich.App. 570, 221 N.W.2d 394 (1974) (governmental entity's failure to consider truck traffic held to be a flagrant design defect incapable of being shielded by immunity for tort liability).

Here, SCDOT does not specify when it alleges the design occurred. It is not clear when the intersection was first designed and constructed. However, the intersection was signalized in 1979 and the traffic light pattern and timing was changed in 1990. Regardless of which time frame we are concerned with, SCDOT remains liable for a dangerous condition if it was aware of that condition. Accordingly, our analysis hinges on whether there is any evidence SCDOT had actual or constructive notice the intersection was or had become dangerous prior to Rebekah's accident.

■ Viewed in the light most favorable to Wooten, the nonmoving party, we find the following evidence shows SCDOT had actual or constructive notice the intersection was dangerous.

First, there was evidence of actual knowledge. Kenneth Westmoreland, the City Administrator of Greer, testified he had told the SCDOT directly, prior to Rebekah's accident, that this intersection was hazardous for pedestrians.

Furthermore, there was also evidence of constructive notice. Wooten's expert, George Black, testified SCDOT had failed to follow its own professional standards. To begin with, SCDOT had adopted the *Manual on Uniform Traffic Control Devices for Streets and Highways* (Manual) for standards and specifications. The Manual provided professional standards for "all signs, signals, markings, and devices placed on or adjacent to a street or highway by authority of a public body or official having jurisdiction to regulate, warn, or guide traffic."

Both the South Carolina Code and the Manual gave pedestrians the general authority to proceed across unmarked crosswalks when facing a green signal. S.C.Code Ann. § 56–5–970 (1991); Manual § 4–2.05.1. Furthermore, the Manual required the "[o]peration of traffic-actuated signals ... take into consideration the needs of pedestrians as well as vehicular traffic." Manual § 4–3.15. It also required pedestrian detectors be installed where "pedestrian signals are not warranted ... but where occasional pedestrian movements exists and there is inadequate opportunity to cross without undue delay." Manual § 4–3.15.

Black opined SCDOT failed to give proper information to pedestrians, such as signs warning pedestrians not to cross,

pedestrian push-buttons, crosswalks, or "Walk/Don't Walk" pedestrian heads. The Manual governed pedestrian intervals and phases, and required pedestrians "be assured of sufficient time to cross the roadway at a signalized intersection." Manual § 4–4.07. Black concluded the timing of the traffic signal here did not allow a pedestrian to safely cross the road, because a pedestrian needed at least twenty-eight seconds to cross, but the signal allowed a minimum of only twelve seconds.

Additionally, there is evidence from which the jury in this case could have found SCDOT did not follow its own professional standards in addressing the needs of pedestrians at this intersection. The mere existence of sidewalks could have led pedestrians to believe they could safely walk in this area. Moreover, based on the Wootens' testimony pedestrians were given only a fraction of the time needed to cross on a green light, the jury could have decided the intersection became a trap for pedestrians.

Accordingly, the trial judge did not err in denying SCDOT's motions for JNOV or a new trial on this issue.

## B. Discretionary Immunity

SCDOT next alleges it is immune from liability under the section of the act quoted above, and under the section stating the governmental entity is not liable for loss resulting from

> the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee.

S.C.Code Ann. § 15–78–60(5) (Supp.1996); see also, S.C.Code Ann. § 15–78–60(15).

The South Carolina Supreme Court has defined discretionary immunity:

> Discretionary immunity is contingent on proof that the Highway Department, faced with alternatives, actually weighed competing considerations and made a conscious choice. The governmental entity must show that in weighing the competing considerations and alternatives, it utilized

accepted professional standards appropriate to resolve the issue before it.

*Strange,* 314 S.C. at 429, 445 S.E.2d at 440.

■ SCDOT argues it specifically considered, and weighed, several facts in deciding not to change the intersection in 1990. First, it alleges pedestrian traffic at the intersection was "virtually nonexistent."

However, Rochelle Garrett, SCDOT's assistant district traffic manager, testified no studies on pedestrian counts were done at this intersection until after Rebekah's accident. Moreover, the jury could have rejected Garrett's testimony in favor of evidence Wooten presented showing pedestrian traffic did exist. For instance, sidewalks, which are normally associated with pedestrian use, line both sides of the primary street. The adjacent businesses include a McDonald's, a Pizza Hut, a bank, a medical office and pharmacy, a car lot, and a hospital. Wooten presented several witnesses who testified they had seen pedestrians crossing the street.

Additionally, the Manual gives detailed criteria, referred to as "warrants," which should be considered when deciding whether or not to install a variety of traffic signals. SCDOT did not show it weighed and considered these warrants when designing the intersection.

SCDOT also claims it was bound by the Manual, which outlined specific circumstances when certain signs or signals were needed. Manual § 4–3.02. The department alleges it was justified in not installing pedestrian controls at this intersection because there were not enough pedestrians to need signals or signs under the criteria outlined in the Manual.

However, in order to exercise discretion under the Manual's criteria:

A comprehensive investigation of traffic conditions and physical characteristics of the location is required to determine the necessity for a signal installation and to furnish necessary data for the proper design and operation of a signal that is found to be warranted.

Manual § 4.3.01. SCDOT has not shown it complied with this mandate by conducting a thorough investigation.

Next, SCDOT argues it considered the lack of history of pedestrian accidents in deciding not to change the intersection in 1990. Rochelle Garrett testified SCDOT had not received any complaints from the public about pedestrian problems before Rebekah's accident. She acknowledged, however, someone had complained to the department when a student was killed trying to cross the intersection on a bicycle several years earlier. In addition, as noted earlier, the city administrator for Greer testified he had received complaints about the intersection before Rebekah's accident, and had relayed these to department, but he "had the feeling that we had a difficult time even getting [SCDOT] to recognize that it was a dangerous intersection." Whether there was a history of accidents which put SCDOT on notice of a potentially dangerous situation is a quintessential matter for the jury.

Finally, SCDOT argues the communications it had with the principal of Greer Middle School during 1991 provide evidence it considered competing considerations and acquiesced to the wishes of the school. Although this testimony does provide some evidence of weighing opposing considerations, it also tends to show notice to SCDOT that students were crossing Wade Hampton. Credibility of the witnesses and the weight to be accorded specific evidence are clearly factual matters for the jury. *Wayne Smith Constr. Co. v. Wolman, Duberstein, & Thompson,* 294 S.C. 140, 363 S.E.2d 115 (Ct.App.1987).

To conclude, there is conflicting evidence on the issue of whether SCDOT weighed competing considerations and exercised accepted professional standards. Accordingly, the trial judge did not err in denying SCDOT's post-trial motions which alleged these matters should be decided as a matter of law.

## C. Liability Cap of the Tort Claims Act

SCDOT argues the trial judge erred in refusing to grant its motion for remittitur to $250,000 under the Tort Claims Act.

The Tort Claims Act limits a single person's recovery to $250,000 "regardless of the number of agencies or political subdivisions involved." S.C.Code Ann. § 15–78–120(a)(1) (Supp.1996). The Act became effective on July 1, 1986. In 1988 our legislature enacted the Uniform Contribution Among

Tortfeasors Act, S.C.Code Ann. §§ 15–38–10 through 15–38–70 (Supp.1996). Because the Tort Claims Act allowed percentage shares within the cap and the Uniform Contribution Among Tortfeasors Act permitted unlimited pro-rata liability, there was an irreconcilable conflict between the two statutes. In response, the South Carolina Supreme Court held two sections of the Tort Claims Act, §§ 15–78–100(c) and 15–78–120(a)(1), were repealed. *Southeastern Freight Lines v. City of Hartsville,* 313 S.C. 466, 443 S.E.2d 395 (1994). *Southeastern Freight* was decided on April 25, 1994. The legislature, in turn, reenacted the two provisions effective July 1, 1994. Section 15–78–120(a)(1) was "made retroactive to April 5, 1988, the effective date of the South Carolina Contribution Among Tortfeasors Act, except for causes of action that have been filed in a court of competent jurisdiction before July 1, 1994." 1994 Acts 497, Part II, § 107B(1).

■ Rebekah filed her complaint during 1993. Accordingly, her action falls within the exception detailed in the 1994 reenactment because it was a cause of action filed before July 1, 1994. *Southeastern Freight* does not limit its application to cases involving contribution among joint tortfeasors. Therefore, Rebekah's verdict comes within the time frame when the cap was repealed.

The trial judge correctly determined she was entitled to the entire verdict, less amounts paid by the two co-defendants.

**AFFIRMED.**

GOOLSBY and HUFF, JJ., concur.