578 S.E.2d 16

**Ronald E. CLARK, Sr., individually and as Personal Representative of the Estate of Amy Danielle Clark, Respondent,**

v.

**SOUTH CAROLINA DEPARTMENT OF PUBLIC SAFETY and Charles Clyde Johnson, Defendants,**

**Of whom South Carolina Department of Public Safety is the Appellant.**

**No. 3565.**

Court of Appeals of South Carolina.

Heard Sept. 10, 2002.
Decided Nov. 12, 2002.
Rehearing Denied April 4, 2003.

Andrew F. Lindemann and William H. Davidson, II, both of Columbia, for Appellant.

Sammy Diamaduros, of Union; Suzanne E. Coe, of Atlanta, for Respondent.

GOOLSBY, J.:

This case arises out of the death of a motorist who was struck and killed by a suspect fleeing from a high-speed police pursuit. Ronald Clark, as personal representative of the estate of his daughter, Amy Clark, sued the South Carolina Department of Public Safety (the Department) and Charles Clyde Johnson, the suspect, after Amy was fatally injured when Johnson crossed the center line and struck her vehicle. Clark alleged the Department's employees failed to properly supervise the pursuit and to terminate it before the fatal accident. The jury returned a verdict for Clark against both the Department and Johnson. The Department appeals. We affirm.

## FACTS

In the early morning hours of April 5, 1997, state trooper Greg Bradley of the South Carolina Highway Patrol observed a van driven by Johnson traveling 57 m.p.h. in an area with a posted speed limit of 45 m.p.h. Johnson, who was under the influence of drugs and alcohol, was driving erratically and not using his turn signals. Bradley activated his blue lights and siren and attempted to stop the van, but Johnson refused to stop. Bradley called in the van's license plate number to dispatchers and advised he was commencing pursuit.

Johnson made several turns, disregarded a stop sign, and eventually stopped in a gravel parking lot. As Bradley exited his vehicle and approached the back of the van, Johnson suddenly put the van into reverse and tried to run over him. Johnson hurriedly drove off, throwing gravel into the air.

Bradley advised the dispatchers that he had almost been hit, and he resumed the pursuit. Bradley saw Johnson run off the left side of the road and spin around while traveling at a high rate of speed. Bradley radioed that he believed Johnson was going to wreck the vehicle.

Trooper Thomas Justice joined the pursuit and attempted to slow the van down by pulling in front of it. Johnson went around him by driving into the opposing lane of traffic. It was approximately 1:30 a.m. and there was no traffic at that time. Bradley continued following Johnson, and Justice fell into position behind Bradley. As the secondary officer involved in the pursuit, Justice took over most of the radio communications so Bradley could focus on the pursuit.

Around the time Justice joined the pursuit, dispatchers notified the troopers that the van had been reported stolen. Bradley observed light traffic as they drove through a straight portion of the road. Bradley attempted to pass Johnson on the left and get in front of the van in order to slow it down, but Johnson tried to run him off the road. As they approached an intersection, Johnson ran a red light and almost "T-boned," or broadsided, another car. The troopers slowed down to safely clear the intersection. The troopers traveled at speeds of 80 and 85 m.p.h. in their attempt to catch Johnson.

As Johnson proceeded toward the North Carolina border, then only five or six miles away, he came upon a pickup truck. Johnson tried to pass the truck on the right using the emergency lane, but the truck also pulled to the right. Johnson immediately jerked the van to the left, crossed the center line, and crashed head-on into a vehicle driven by Amy Clark. The van became airborne before crashing into some nearby woods and catching on fire. The troopers' cars did not make contact with the other vehicles. The entire chase occurred over an area of approximately eight miles and lasted from six to eight minutes.

Amy died at the scene.[1]

---

1. Johnson pled guilty in September 1997 to charges of felony DUI causing death, failure to stop for a blue light resulting in death, felony DUI causing great bodily injury, assault with intent to kill, and possession of a stolen vehicle. It was stipulated at trial that Johnson regis-

Sergeant John Vaughn was the district supervisor on call that night. Vaughn called in and inquired whether a supervisor was needed when he heard Bradley tell the dispatchers he was initiating a pursuit. Vaughn could not recall, however, whether he had actually monitored any portion of the pursuit. Trooper Lonnie Plyler, the supervisor for the second shift,[2] did not monitor the pursuit because he was handling the administration of a breathalyzer examination. Plyler was unaware who the third-shift supervisor was for that evening, but Plyler did go to the scene of the accident after Justice radioed for a supervisor.

Clark brought this action under the South Carolina Tort Claims Act against the Department and Johnson for the death of his daughter. Johnson went into default and was unable to contest his liability. At trial, the jury returned a verdict for Clark for $3.75 million in total damages against both Johnson and the Department on his wrongful death claim. The jury apportioned 80 per cent fault to Johnson and 20 per cent to the Department, resulting in a verdict against Johnson for $3.0 million and against the Department for $750,000. The trial court reduced the verdict against the Department to $250,000 in accordance with the limit imposed by the Tort Claims Act.[3]

Although it is not clear from the transcript, at some point the jury submitted a note regarding its verdict, which reads as follows:

The Vehicle [and] Foot Pursuit Policy of SCDPS [the Department] dictates supervision of all pursuits. During this pursuit no supervisors were present or notified until after the pursuit was ended. It is our decision that this designates gross neglect on the behalf of SCDPS.

---

tered a .244 on a blood alcohol test and also tested positive for marijuana and cocaine.

**2.** The accident occurred during the third shift.

**3.** The Tort Claims Act was subsequently amended to increase the limitation on liability to $300,000 per person because of loss arising from a single occurrence. *See* S.C.Code Ann. § 15-78-120(a)(1) (Supp. 2001).

The Department thereafter moved for JNOV, new trial absolute, and new trial *nisi remittitur*. The trial court denied the motions. The Department appeals.

## LAW/ANALYSIS

### I. Denial of DV and JNOV Motions

The Department first contends Clark was unable to sustain his burden of proof regarding its liability for Amy's death. Specifically, the Department argues the trial court erred in denying its motions for a directed verdict and for JNOV because Clark failed to demonstrate Bradley was grossly negligent in initiating, continuing, or failing to terminate the pursuit of Johnson. The Department also asserts the jury's note constituted a special verdict indicating the jury did not find the trooper was grossly negligent, and there could be no "derivative" or "cumulative" liability by the supervisor in the absence of gross negligence by the trooper. The Department argues it is, therefore, entitled to judgment as a matter of law.

The Tort Claims Act renders state agencies and governmental entities "liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations" and exemptions contained within the Act.[4]

In addition to the Tort Claims Act, section 56–5–760 of the South Carolina Code addresses the civil liability of operators of authorized emergency vehicles. This statute authorizes police officers using a vehicle equipped with a siren and flashing light to exceed the maximum speed limit and to disregard certain traffic regulations during a police pursuit.[5] The statute further provides, however, that these provisions "do not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons." [6]

---

**4.** S.C.Code Ann. § 15–78–40 (Supp.2001).

**5.** S.C.Code Ann. § 56–5–760(A)–(C) (1991).

**6.** *Id.* § 56–5–760(D).

■ At trial, the parties agreed the applicable standard for liability in this case was gross negligence, and the trial court charged the jury that it was to determine whether the defendants' gross negligence proximately caused injury to the plaintiff.[7] Because no issue is raised on appeal regarding the standard for culpability, it becomes the law of the case and we will, therefore, apply the gross negligence standard agreed to by the parties.[8]

---

7. Section 56–5–760(D) imposes upon emergency vehicle operators *"the duty to drive with due regard for the safety of all persons." Id.* (emphasis added). Prior to its amendment in 1990, however, the former version stated its provisions "shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons *nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."* S.C.Code Ann. § 56–5–760(d) (Supp.1989) (emphasis added); *see* Act No. 149, § 3, 1990 S.C. Acts 312. Case law interpreting this former version applied a "reckless conduct" standard. *See, e.g., Jones v. Way,* 278 S.C. 295, 294 S.E.2d 432 (1982). We note that, in stating a gross negligence standard applied, trial counsel referred to the statute's language regarding reckless conduct, but the 1990 amendment deleted the reference to reckless acts. Upon reviewing the statute, the trial court opined whether it reduced the burden from gross negligence to ordinary negligence, but no issue was pursued by counsel in this regard. There is some divergence among the jurisdictions as to whether "the duty to drive with due regard for the safety of all persons" imposes an ordinary negligence standard, a reckless conduct standard, or something in between. *See, e.g., City of Amarillo v. Martin,* 971 S.W.2d 426, 428–30 (Tex.1998) (interpreting a Texas statute, similar to South Carolina's pre–1990 version, which stated drivers of emergency vehicles had a duty to exercise "due regard for the safety of all persons" but were not exempted from liability for "the consequences of [their] reckless disregard for the safety of others" and holding it imposed liability only for the reckless operation of an emergency vehicle, rather than for mere negligence). We further note the jury was not charged on any immunity provision under the Tort Claims Act containing a gross negligence standard.

8. *See ML–Lee Acquisition Fund, L.P. v. Deloitte & Touche,* 327 S.C. 238, 489 S.E.2d 470 (1997) (holding an unappealed ruling becomes the law of the case and precludes further consideration of the issue on appeal); *cf. Kolster v. City of El Paso,* 972 S.W.2d 58 (Tex.1998) (observing the trial court erroneously determined that ordinary negligence, rather than recklessness, was the proper standard under a Texas statute addressing the liability of emergency vehicle operators for accidents where the statute provided drivers were not exempted for "reckless" conduct; the appellate court stated it would, nevertheless, apply a simple negligence standard on appeal because that was the standard

Gross negligence has been defined a number of ways. Our supreme court recently stated "[g]ross negligence is the intentional, conscious failure to do something which is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." [9] "It is the failure to exercise even the slightest care." [10] It has also been defined as "the absence of care that is necessary under the circumstances." [11]

The existence of gross negligence is ordinarily a mixed question of both law and fact.[12] "When the evidence supports but one reasonable inference, it is solely a question of law for the court[;] otherwise it is an issue best resolved by the jury." [13]

"In ruling on motions for directed verdict and JNOV, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt." [14] "The trial court can only be reversed by this Court when there is no evidence to support the ruling below." [15]

As noted above, the jury submitted a statement at trial regarding its verdict. The statement suggested the jury found the Department grossly negligent because of the failure

submitted to the jury and the City did not preserve any issue as to the proper standard of culpability).

9. *Faile v. South Carolina Dep't of Juvenile Justice*, 350 S.C. 315, 331, 566 S.E.2d 536, 544 (2002) (quoting *Richardson v. Hambright*, 296 S.C. 504, 506, 374 S.E.2d 296, 298 (1988)).

10. *Id.* at 331–32, 566 S.E.2d at 544 (citing *Hollins v. Richland County Sch. Dist. One*, 310 S.C. 486, 427 S.E.2d 654 (1993)).

11. *Hicks v. McCandlish*, 221 S.C. 410, 415, 70 S.E.2d 629, 631 (1952).

12. *Faile*, 350 S.C. at 332, 566 S.E.2d at 545.

13. *Id.*

14. *Strange v. South Carolina Dep't of Highways & Pub. Transp.*, 314 S.C. 427, 429–30, 445 S.E.2d 439, 440 (1994).

15. *Id.* at 430, 445 S.E.2d at 440; *see also Creech v. South Carolina Wildlife & Marine Resources Dep't*, 328 S.C. 24, 491 S.E.2d 571 (1997).

of supervisors to monitor the pursuit and the failure to call it off. In its brief, the Department argues the statement served the same purpose as a special verdict. The Department also argues the trial court erred in denying its motions for a directed verdict and JNOV because the allegations regarding the lack of supervision only gave rise to "derivative" or "cumulative" liability and do not independently support the jury's verdict in the absence of gross negligence by the trooper.

■ We hold, however, the note did not transform the verdict into a special verdict and there was evidence to warrant submission of the question of the Department's liability to the jury. The statement does not exclude a finding of gross negligence on the part of Bradley and does not constitute part of the verdict. The transcript indicates the trial court made no mention of the note in publishing the verdict, nor did it otherwise treat the note as part of the verdict. As such, we find the note was not a special verdict that limited the ground for the jury's finding to the acts and omissions of the Department's supervisors.

Moreover, although the Department attempts to base its lack of liability solely on the actions of the trooper, the issue in this case is whether there was any evidence of gross negligence by the Department, through the acts and omissions of its employees, which consists of both the troopers and the supervisors. We agree with the trial court that the liability of the supervisors referred to in this case is distinguishable from cases alleging vicarious liability on the part of a supervisor. Rather, there were two sets of duties involved. First, the trooper, as the pursuing officer, had a "duty to drive with due regard for the safety of all persons."[16] Clark's expert in high-speed police chases, Samuel Killman, testified the standard for a pursuing trooper is that he must continue to evaluate the need to apprehend the suspect versus the danger of the pursuit to the public's safety and try to balance those competing concerns. Secondly, Killman testified the supervisors at the Department had an independent duty to monitor the acts of the troopers and take any actions deemed appropriate, including termination of the chase. He based this duty on

16. S.C.Code Ann. § 56–5–760.

both the Department's own internal policy and on general standards of conduct recognized by law enforcement agencies, primarily the latter.

The evidence in the light most favorable to Clark shows Killman testified the pursuit should have been called off after it was obvious Johnson was willing to do whatever it took to get away. Killman stated that, after Johnson attempted to run Bradley off the road and then almost "T-boned" a car at an intersection, Bradley should have called off the pursuit in the interest of public safety. At the time of the fatal crash, Johnson was only five or six miles from the North Carolina border, at which point South Carolina authorities would have had to terminate the pursuit anyway. The heightened dangerousness of the pursuit is particularly evidenced by the fact that Bradley himself admittedly notified dispatchers at one point that he believed a crash was imminent.[17] Although Killman indicated it was an "error in judgment" not to call off the pursuit, we believe the foregoing is some evidence from which a jury could determine Bradley should have called off the pursuit and was grossly negligent in failing to do so. Also, Killman testified that, in accordance with general police standards, a supervisor should always monitor a pursuit and provide an independent assessment of its continued viability. There was no evidence a supervisor did this.

We hold the question of whether the troopers and the supervisors at the Department performed their respective duties or whether there was an "absence of care that is necessary under the circumstances" [18] was a matter singularly for the jury to consider as the trier of fact.

## II. Immunity Under Section 15–78–60(5) for Discretionary Acts

The Department next asserts Bradley's conduct was subject to absolute discretionary immunity under section 15–78–60(5)

---

17. Bradley testified that, at one point in the chase when Johnson's "speed was so high that [the van] traveled off the left side of the roadway" and spun around in the opposing lane, he "called into communications that he had ten fifty or I felt like he was going to wreck the vehicle."

18. *Hicks,* 221 S.C. at 415, 70 S.E.2d at 631.

of the Tort Claims Act. This section provides a governmental entity is not liable for a loss resulting from:

the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee.... [19]

■ "The burden of establishing a limitation upon liability or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense." [20]

■ "To establish discretionary immunity, the governmental entity must prove that the governmental employees, faced with alternatives, actually weighed competing considerations and made a conscious choice." [21] "Furthermore, 'the governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them.'" [22] "This standard is inherently factual." [23]

On appeal from the denial of a directed verdict motion, this court should review the evidence in the light most favorable to Clark to see if the evidence yields more than one reasonable inference and the trial court properly submitted the case to the jury.[24] That is, we would consider whether there was an issue of fact as to whether (1) the Department's employees actually weighed competing considerations and made a conscious choice to continue the pursuit, and (2) whether the

19. S.C.Code Ann. § 15–78–60(5) (Supp.2001).

20. *Niver v. South Carolina Dep't of Highways & Pub. Transp.*, 302 S.C. 461, 463, 395 S.E.2d 728, 730 (Ct.App.1990); *accord Foster v. South Carolina Dep't of Highways & Pub. Transp.*, 306 S.C. 519, 413 S.E.2d 31 (1992).

21. *Pike v. South Carolina Dep't of Transp.*, 343 S.C. 224, 230, 540 S.E.2d 87, 90 (2000).

22. *Id.* (citation omitted).

23. *Id.* at 232, 540 S.E.2d at 91.

24. *See Strange*, 314 S.C. at 429–30, 445 S.E.2d at 440.

Department established that, in weighing these alternatives, it applied accepted professional standards.[25]

 Clark presented the testimony of his expert in high-speed chases, Samuel Killman, that the Department's employees did not properly balance the competing considerations of capturing a fleeing suspect versus maintaining the public's safety and that they disregarded appropriate standards in failing to terminate the pursuit. The Department attempted to rebut this evidence with Bradley's testimony that he did weigh these competing concerns. This created a question of fact that could not be resolved by the trial court. Accordingly, we hold the trial court properly denied the Department's motions for judgment as a matter of law on the ground of discretionary immunity.

 Moreover, we question whether the discretionary immunity provision is applicable to this case in any event. Some jurisdictions determine whether an act is discretionary by considering if it can best be described as planning or operational.[26] In this case, we believe the function of the Department's employees in carrying out a general pursuit policy is operational in nature and is not the type of discretionary act contemplated in the Tort Claims Act. The fact that the employees had to make decisions or exercise some judgment in their activities is not determinative.[27] To read the exception

25. *See Pike*, 343 S.C. at 232, 540 S.E.2d at 91.

26. *See* 57 Am.Jur.2d *Municipal, County, School, and State Tort Liability* § 78 (2001) ("[D]ecisions involving the assessment of competing priorities, weighing of budgetary considerations, or allocation of scarce resources are generally considered planning activities and are subject to [discretionary] immunity.... However, the fact that a governmental function involves an element of choice or judgment, or requires the ability to make responsible decisions, does not automatically bring that activity within the discretionary function exemption. Instead, the function must entail planning or policy decisions. This approach to determining the presence of a discretionary function as opposed to a ministerial one is most often characterized as the planning/operational distinction.").

27. *See Brown v. City of Pinellas Park*, 557 So.2d 161 (Fla.Dist.Ct.App. 1990) (holding, in wrongful death action alleging the defendants negligently conducted a high-speed chase, during which the fleeing suspect broadsided the plaintiffs' car, causing the deaths of their two daughters,

that broadly would encompass virtually all traffic stops made by the Department's employees, as they all involve some degree of decision-making, but they are not the type of discretionary act envisioned under the Tort Claims Act.[28]

## III. Immunity Under Section 15-78-60(4) for the Failure to Enforce Written Policies

The Department next alleges it was entitled to absolute immunity as a matter of law under section 15-78-60(4) of the Tort Claims Act. In the alternative, the Department argues it is entitled to a new trial because the court allegedly refused to charge this immunity provision after Clark's counsel raised

---

that the acts of the officers in continuing the high-speed pursuit were operational, not discretionary; the court noted this suit concerned how the governmental policies of enforcing traffic laws and pursuing violators were actually implemented and, though some measure of discretion might be involved, this was not the type of planning or discretionary function that needed to be insulated from suit); *Tice v. Cramer*, 133 N.J. 347, 627 A.2d 1090, 1101 (1993) (limiting discretionary immunity to discretion exercised at the highest levels of government in matters of policy and planning, the court stating an "officer's conduct, comprised of the decision whether to pursue, how to pursue, and whether to continue to pursue, is . . . infinitely distant from high-level policy or planning decisions," and "to label this kind of determination by a public employee 'discretionary,' and therefore immune, would end all public employee liability, or practically all, for hardly any acts or omissions are not subject to some judgment or discretion"); *Lowrimore v. Dimmitt*, 310 Or. 291, 797 P.2d 1027, 1030 (1990) (Discretionary "immunity will apply to decisions involving the making of policy, but not to routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action. A traffic officer's decision to pursue a vehicle . . ., though discretionary in the sense that it involves the exercise of judgment and choice by the officer, is not one that qualifies its maker to immunity . . . [as it] does not create any departmental policy and was not made by a person 'with governmental discretion.' Although the decision to pursue may have been made pursuant to a county departmental policy, the decision itself is not a policy judgment . . . .") (citation omitted).

28. We note there is a divergence of authority in this area, and some jurisdictions have held the decision to continue a police pursuit is entitled to some form of discretionary immunity. *See, e.g., Estate of Cavanaugh v. Andrade*, 202 Wis.2d 290, 550 N.W.2d 103, 114 (1996) (holding an officer's decision to initiate or continue a high-speed chase was a discretionary act that was entitled to immunity, but noting that an officer may still be deemed negligent "for failing to physically operate his or her vehicle with due regard for the safety of others").

purported violations of the Department's Pursuit Policy during closing argument.

Section 15–78–60(4) provides a governmental entity is not liable for losses resulting from the

adoption, enforcement, or compliance with any law or failure to adopt or enforce any law, whether valid or invalid, including, but not limited to, any charter, provision, ordinance, resolution, rule, regulation or written policies. . . . [29]

In 1996, the Department adopted the South Carolina Department of Public Safety Policy Directive, Vehicle and Foot Pursuit Policy, which addresses the duties of troopers and their supervisors. The Pursuit Policy requires a supervisor to monitor all pursuits and states in relevant part: "The supervisor will continuously evaluate pursuit and will order termination of the pursuit when it appears to constitute an unreasonable risk."

Citing section 15–78–60(4), the Department asserts it is immune from liability for failing to enforce any written policy, in this case, the Pursuit Policy's guideline that a supervisor monitor all pursuits.

In denying the Department's directed verdict motion at the end of the plaintiff's case, the trial court found the Department was not entitled to absolute immunity under section 15–78–60(4) for the failure to enforce any law or written policy, stating, "I don't think it was a policy violation. I think it was a violation of the standard of care that they are supposed to provide to the public."

 We hold the trial court properly refused to grant the Department judgment as a matter of law because the actions of the Department do not fall within the parameters of section 15–78–60(4). As noted by Clark, the Pursuit Policy was merely a statement of generally accepted law enforcement guidelines. This broad provision is not the kind of written policy that should be afforded the protection of absolute immunity under the Tort Claims Act.[30]

---

29. S.C.Code Ann. § 15–78–60(4) (Supp.2001).

30. *See, e.g., Wortman v. Spartanburg*, 310 S.C. 1, 3, 425 S.E.2d 18, 19 (1992) ("When interpreting a statute, the Court's primary function is to

The duty of the supervisor to monitor the pursuit was testified to as the standard of care without reference to the policy adopted by the Department. The Department asserted, and Clark expressly agreed, that this internal policy did not equate to a legal standard of care for the Department's supervisors. The policy mirrors the accepted standard of care for supervisors during a pursuit. The mere fact that the Department enacted a policy does not protect it from having to meet a standard of care that exists whether the policy was enacted or not. The underlying action is not brought as a violation of the Department's policy, but as a violation of the recognized duty of care that supervisors owe during the monitoring of a high-speed pursuit.

To the extent the Department appears to challenge the trial court's failure to charge the jury on this immunity provision, we find this issue is not preserved. In the order denying the Department's post-trial motions, the trial court specifically noted that the Department never objected to its failure to charge section 15–78–60(4).[31]

### IV. Jury Instruction Regarding Standard of Care

The Department next contends the trial court erred in failing to charge the jury on the legal duty or standard of care owed by law enforcement officers with respect to police pursuits. The Department asserts the trial court instead permitted the jury to determine the standard of care to be applied based upon the testimony of expert witnesses. We do not read the court's charge that way.

The trial court's charge did not allow the jury to determine the law. Rather, the court charged the jury on general principles of negligence law. Further, the Department did not clearly and specifically request a jury instruction regarding the existence and nature of any alleged duty by its supervisors

---

ascertain the intention of the legislature. The words used in the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation.").

**31.** Issues raised on directed verdict are preserved even if no issue is preserved as to the jury instructions. *See Thomasko v. Poole,* 349 S.C. 7, 561 S.E.2d 597 (2002).

to monitor all police pursuits. Thus, we find no reversible error in this regard.[32]

## V. New Trial Absolute

The Department asserts it is entitled to a new trial absolute because the verdict is excessive and shockingly disproportionate to the damages sustained so as to indicate that the jury acted out of passion, caprice, prejudice, or other improper considerations.

■ A motion for new trial *nisi remittitur* asks the trial court in its discretion to reduce the verdict because it is "merely excessive," although not motivated by considerations such as passion, caprice, or prejudice.[33] In contrast, if the amount of the verdict is "grossly excessive," so as to be the result of passion, caprice, prejudice, or some other influence outside the evidence, the trial judge must grant a new trial absolute, rather than a new trial *nisi remittitur*.[34]

■ The jury's determination of damages is entitled to substantial deference.[35] The denial of a new trial motion is

---

32. *See generally Morris v. Barrineau,* 269 S.C. 84, 236 S.E.2d 409 (1977) (holding the judge's general charge on negligence, considered as a whole, adequately covered the principles of law applicable to the facts of the case); *Joyner v. Atl. Coast Line R.R.,* 91 S.C. 104, 110, 74 S.E. 825, 827 (1912) (finding no error in the trial judge's instructions where "[a]n examination of the judge's charge as a whole will show that he fully charged the jury as to the law applicable to the case and left the facts to them"); *Rochester v. Bull,* 78 S.C. 249, 252, 58 S.E. 766, 767 (1907) ("The court certainly stated correct propositions of law. True they were general principles, but, if the defendant wished anything more specific, he should have requested it."); *Welch v. Epstein,* 342 S.C. 279, 311, 536 S.E.2d 408, 425 (Ct.App.2000) ("When reviewing a jury charge for alleged error, an appellate court must consider the charge as a whole in light of the evidence and issues presented at trial.").

33. *See O'Neal v. Bowles,* 314 S.C. 525, 431 S.E.2d 555 (1993); *Hunter v. Staples,* 335 S.C. 93, 515 S.E.2d 261 (Ct.App.1999).

34. *Hunter,* 335 S.C. at 105, 515 S.E.2d at 268.

35. *Rush v. Blanchard,* 310 S.C. 375, 426 S.E.2d 802 (1993); *Brabham v. S. Asphalt Haulers, Inc.,* 223 S.C. 421, 76 S.E.2d 301 (1953).

within the discretion of the trial court and, absent an abuse of discretion, it will not be reversed on appeal.[36]

Section 15-51-20 provides a wrongful death action may be brought for the benefit of the statutory beneficiaries, in this case, the parents.[37] "Damages recoverable for wrongful death are the damages sustained by the statutory beneficiaries resulting from the death of the decedent, including pecuniary loss, mental shock and suffering, wounded feelings, grief, sorrow, and loss of society and companionship." [38]

The jury awarded Clark a verdict of $3.75 million in total damages against Johnson and the Department on his wrongful death claim. The jury apportioned 80 per cent fault to Johnson and 20 per cent fault to the Department, resulting in verdicts against Johnson for $3.0 million and against the Department for $750,000. The trial court reduced the verdict against the Department to $250,000 as required by the Tort Claims Act.

In *Lucht v. Youngblood*,[39] our supreme court observed that losses to parents for the untimely death of a child "are intangibles, the value of which cannot be determined by any fixed yardstick." [40] The "loss to the beneficiaries must be estimated by the jury in the exercise of their sound judgment under all the facts and circumstances of the case." [41]

In *Knoke v. South Carolina Department of Parks, Recreation and Tourism*,[42] the court concluded a wrongful death verdict of $3.0 million for the death of a twelve-year-old child was not an excessive verdict. The court stated: "Although there was no evidence of pecuniary loss introduced at trial,

---

36. *Cock-N-Bull Steak House, Inc. v. Generali Ins. Co.*, 321 S.C. 1, 466 S.E.2d 727 (1996).

37. S.C.Code Ann. § 15-51-20 (Supp.2001).

38. *Ballard v. Ballard*, 314 S.C. 40, 41-42, 443 S.E.2d 802, 802 (1994).

39. 266 S.C. 127, 221 S.E.2d 854 (1976).

40. *Id.* at 137, 221 S.E.2d at 859.

41. *Id.*

42. 324 S.C. 136, 478 S.E.2d 256 (1996).

both parents testified to their grief, shock, and sense of loss. In the absence of pecuniary loss, the $3,000,000 verdict was to compensate Jeremy's parents for these intangible damages which, as previously noted by this Court, cannot be determined by any fixed measure." [43]

Given the nature of the loss endured by Clark, and the necessarily nonpecuniary elements involved, we are not persuaded the verdict was the result of passion or other improper motive, nor is it so excessive as to shock the conscience. Consequently, we hold the trial court did not abuse its discretion in declining to grant a new trial. [44]

## VI. More Detailed Order

The Department finally alleges "[t]he trial court erred in refusing to issue an order setting forth in reasonable detail the legal analysis supporting its denial of [its] post-trial motions."

Citing *Bowen v. Lee Process Systems Co.,*[45] the Department states it is "rais[ing] this issue in the event this Court finds that it cannot properly review the denial of the post-trial motions without knowing the trial court's reasoning for its rulings."

In *Bowen*, the trial court granted summary judgment to the defendants, but failed to state on which of several asserted grounds it was relying. We vacated the grant of summary judgment and remanded the case to the trial court to enter an order identifying the material facts it found undisputed and the grounds for its decision as they were not discernable on appeal.

We conclude *Bowen* is distinguishable from the current appeal. The trial court's order denying the Department's post-trial motions is sufficient as the court's reasoning for the denial can be determined from the record on appeal. Further,

---

43. *Id.* at 142, 478 S.E.2d at 258–59.

44. *Cf., e.g., Scott v. Porter,* 340 S.C. 158, 530 S.E.2d 389 (Ct.App.2000) (stating South Carolina law provides a presumption of nonpecuniary damages and there is no mathematical formula for calculating a parent's loss, and concluding a wrongful death verdict of $1.5 million for the death of a nineteen-month-old child was not grossly excessive).

45. 342 S.C. 232, 536 S.E.2d 86 (Ct.App.2000).

there is no blanket requirement that the trial court set forth a separate explanation on all of its rulings on post-trial motions.[46]

Accordingly, the judgment is

**AFFIRMED.**

HOWARD and SHULER, JJ., concur.

---

46. *See, e.g., Bailey v. Segars,* 346 S.C. 359, 550 S.E.2d 910 (Ct.App. 2001) (holding a form order stating only that the appellant's post-trial motions for JNOV and new trial were denied was, together with the record of the proceedings, adequate to enable appellate review), *cert. granted on other grounds,* (Jan. 10, 2002).