540 S.E.2d 87

Michael PIKE, as Personal Representative of the Estate of Melissa P. Pike, Respondent,

v.

SOUTH CAROLINA DEPARTMENT OF TRANSPORTATION, Petitioner.

No. 25208.

Supreme Court of South Carolina.

Heard Oct. 4, 2000.
Decided Nov. 6, 2000.

William McBee Smith of Smith & Haskell, L.L.P., of Spartanburg, for petitioner.

James Fletcher Thompson of Thompson & Sinclair, of Spartanburg, for respondent.

WALLER, Justice:

This is a wrongful death action. Respondent's wife, Melissa Pike (Melissa), was involved in a car accident at an intersection in Spartanburg; she died from injuries sustained in the

collision. The jury found petitioner, the Department of Transportation (DOT), liable in the amount of $730,000. The DOT appealed, and the Court of Appeals affirmed. *Pike v. South Carolina Dep't of Transp.*, 332 S.C. 605, 506 S.E.2d 516 (Ct.App.1998). We granted the petition for a writ of certiorari to review the Court of Appeals' decision. We affirm as modified.

## FACTS

The accident occurred on June 24, 1992, when Melissa attempted to turn left from Park Road onto United States Highway 176. A car traveling south on Highway 176 collided with Melissa's car. She died the next day. Respondent alleged that the DOT was negligent in failing to move a directional sign, reading "CHAPMAN HIGH SCHOOL," because the sign obstructed motorists' view of oncoming traffic from Highway 176 when they were stopped at the stop sign on Park Road. Respondent also claimed that the DOT negligently maintained the intersection by not installing a traffic signal. The DOT asserted discretionary immunity under the South Carolina Tort Claims Act as a defense.

The trial court denied the DOT's motions for directed verdict. The jury found in favor of respondent and awarded $730,000. In addition to moving for JNOV, or in the alternative, a new trial, the DOT also moved to reduce the verdict to $250,000, the statutory cap under the Tort Claims Act. The trial court denied the DOT's post-trial motions.

## ISSUES

1. What is the burden of proof for the affirmative defense of discretionary immunity?

2. Did the trial court err in admitting evidence of prior accidents at the intersection and letters to the DOT regarding the intersection?

3. Does the statutory cap on damages under the South Carolina Tort Claims Act apply to this case?

## 1. BURDEN OF PROOF ON DISCRETIONARY IMMUNITY

The DOT argues that it only needs to produce "some evidence" in order to gain immunity under the South Carolina Tort Claims Act. *See* S.C.Code Ann. § 15–78–60(5) & (15) (Supp.1999).[1] We disagree.

At trial, Respondent presented evidence that the DOT had notice of problems at this intersection based on letters received by the department and accidents occurring at the intersection. Specifically regarding the Chapman High School sign, the DOT received a letter in November 1990 from James Everhart. The letter had a sketch of the intersection and stated that:

> The newly erected Chapman High School sign and the tree limbs over the sidewalk a little farther up toward Asheville make it difficult for one to see the traffic coming from toward [sic] Asheville. Therefore crossing this intersection is a little dangerous.
>
> Removal of sign, trimming limbs and installing a traffic light might be the answer to this dangerous situation.

Gary Thompson, a DOT district engineer, testified that in response to the Everhart letter, the department sent Rodney Wilson to evaluate the intersection. Wilson was a "civil engineer associate," but he did not have a technical degree of any kind. According to Thompson, Wilson was qualified to gather data upon which sight distances could be calculated,

---

1. Subsection (5) states that a governmental entity is not liable for a loss resulting from "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." Subsection (15) shields the government from liability resulting from:

   > absence, condition, or malfunction of any sign, signal, warning device, illumination device, guardrail, or median barrier unless the absence, condition, or malfunction is not corrected by the governmental entity responsible for its maintenance within a reasonable time after actual or constructive notice.... Nothing in this item gives rise to liability arising from a failure of any governmental entity to initially place any of the above signs, signals, warning devices, guardrails, or median barriers when the failure is the result of a discretionary act of the governmental entity....

   S.C.Code Ann. § 15–78–60(5) & (15) (Supp.1999).

but he was not qualified to actually calculate sight distance.[2] Wilson stated that in November 1990 he *estimated* the available sight distance at the intersection to be between 500 and 600 feet. He also went back to the intersection in July 1991 and determined that the tree limbs did not block visibility.

There was no testimony that anyone other than Wilson visited the intersection between November 1990, when the Everhart letter was received, and June 1992, when Melissa had her accident. Moreover, prior to the accident, no calculations were performed by DOT engineers to determine the minimum sight distance required at the intersection. Instead, Thompson testified that a "rule of thumb" was used to estimate adequate sight distance—ten multiplied by the speed limit. Based on the 40 mph speed limit, Thompson ascertained that 400 feet would be enough sight distance at the intersection. Thompson then relied on Wilson's estimate of 500 to 600 feet of available sight distance and determined that this estimate exceeded the 400 feet "ballpark" estimate for the minimum sight distance required.

Nonetheless, Thompson acknowledged that other variables should be considered when calculating sight distance, such as the grade and width of the road. In addition, Thompson conceded that adequate sight distance is properly calculated based on the "prevailing speed" of motorists, which in this case was 48 mph.[3] Most significantly, Thompson testified that moving the Chapman High School sign was never even contemplated or discussed.

Respondent's expert in traffic engineering, Dr. Robert Roberts, opined that it was a violation of accepted engineering practices to not move a sign when the department had notice that the sign was obstructing motorists' vision. Dr. Roberts

---

**2.** Sight distance is a measure of the visibility from a particular location. We use the term "available sight distance" to refer to the amount of sight distance actually available to a motorist when stopped at the intersection. We use the term "adequate sight distance" or "minimum sight distance required" to refer to the sight distance needed by a motorist stopped at the intersection to safely make a left turn onto Highway 176. When the available sight distance is less than the minimum sight distance required, a safety problem is presented.

**3.** The prevailing speed is also known as the 85th-percentile speed which is the speed at which 85 percent of motorists travel.

also stated that because the Chapman High School sign was a "guide sign," and thus low down on the hierarchy of signs, the sign should have been moved. In Dr. Roberts's opinion, it was a deviation from accepted standards of engineering practices to estimate available sight distance, rather than make precise measurements. Furthermore, Dr. Roberts believed it was inappropriate to estimate the minimum sight distance required based on the rule of thumb; instead, calculations should be done which take into consideration the width of the road and the prevailing speed at the intersection.

Using the prevailing speed of 48 mph, Dr. Roberts calculated the minimum sight distance required at the intersection at 564 feet. This exceeded 525 feet, the actual amount of available sight distance at the intersection.[4] The DOT's expert, Dr. James Clark, had a different opinion. Dr. Clark calculated the required sight distance at 470 feet, which did not exceed 525 feet. Although Dr. Clark admitted that the prevailing speed is usually used to make these determinations and the prevailing speed at this intersection was 48 mph, Dr. Clark used 40 mph in his calculations.

The DOT moved for a directed verdict at the close of Respondent's case, renewed the motion at the close of its own case, and moved for JNOV or a new trial after the verdict. The DOT argued it had presented evidence that it had evaluated competing alternatives in dealing with the intersection and therefore it was entitled to discretionary immunity as a matter of law. The trial court denied the motions.

On appeal, the Court of Appeals found Respondent had presented evidence that the DOT failed to utilize accepted professional engineering standards in analyzing the visibility of the intersection. Although the DOT "presented evidence that could dispute some of [Respondent's] evidence," the Court of Appeals held that Respondent "produced more than enough evidence for the judge to send the issue of discretionary immunity to the jury." *Pike,* 332 S.C. at 612, 506 S.E.2d at 519. Accordingly, the Court of Appeals decided that the

---

4. After Melissa's accident, DOT engineer Rochelle Garrett went to the intersection with Wilson. Stopping at the most restrictive point—the point where Garrett had to look underneath the sign—she measured the available sight distance as 525 feet.

trial court had not erred in denying the directed verdict and JNOV motions.

The Court of Appeals, however, did not address the DOT's argument that it merely had to produce "some evidence" in order to be entitled to immunity. *Id.* at 612 n. 3, 506 S.E.2d at 520 n. 3. The DOT argues that its burden of proof on discretionary immunity is a burden of production, not a burden of persuasion. Specifically, the DOT maintains that a governmental entity must only show more than a scintilla of evidence that it weighed competing considerations and utilized accepted professional standards in order to be entitled to discretionary immunity. Because it presented some evidence of this, the DOT contends that the trial court should not have submitted the case to the jury.

The Tort Claims Act waives immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties. *See* S.C.Code Ann. § 15-78-40 (Supp.1999). There are several exceptions to this waiver of immunity, including what is known as discretionary immunity. *See, e.g.,* S.C.Code Ann. § 15-78-60(5) (Supp.1999). This Court has repeatedly stated that the burden of establishing a limitation on liability or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense. *E.g., Steinke v. South Carolina Dep't of Labor, Licensing and Regulation,* 336 S.C. 373, 520 S.E.2d 142 (1999); *Strange v. South Carolina Dep't of Highways and Pub. Transp.,* 314 S.C. 427, 445 S.E.2d 439 (1994); *Foster v. South Carolina Dep't of Highways and Pub. Transp.,* 306 S.C. 519, 413 S.E.2d 31 (1992).

To establish discretionary immunity, the governmental entity must prove that the governmental employees, faced with alternatives, actually weighed competing considerations and made a conscious choice. *Foster,* 306 S.C. at 525, 413 S.E.2d at 35. Furthermore, "the governmental entity must show that in weighing the competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them. It is not enough to say the defect was noted and a decision was made not to repair it." *Id.*

The DOT asserts that by applying a preponderance of the evidence standard to the discretionary immunity defense, the Court will, in effect, judicially abolish the defense by allowing juries to second guess the DOT's discretionary decisions. It therefore argues that a "some evidence" standard should apply, i.e., a governmental entity merely has the burden of production, not the burden of persuasion.

The DOT's argument is wholly meritless. By adopting a "some evidence" standard, the DOT would avail itself of an affirmative defense but effectively be relieved of proving the defense. This, in our opinion, flies in the face of the well-established rule that the party pleading an affirmative defense "has the burden of proving it." *Hoffman v. Greenville County,* 242 S.C. 34, 39, 129 S.E.2d 757, 760 (1963); *accord McCabe v. Sloan,* 184 S.C. 158, 162, 191 S.E. 905, 906 (1937) ("It seems unnecessary to cite authorities in support of the postulate that when one pleads an affirmative defense, the burden is on him to prove it.").

Furthermore, basic hornbook law compels rejection of the DOT's contention that this burden of proof is merely one of production. A burden of production generally means the burden on a party to come forward with evidence in order to defeat a directed verdict motion. 2 McCORMICK ON EVIDENCE § 336 (5th ed.1999). In other words, the burden of production is directed to the judge. *Id.* In contrast, the burden of persuasion is directed at the jury and comes into play only after the parties have sustained their respective burdens of production. *Id.* Additionally, "the party who has the burden of pleading a fact will have the burdens of producing evidence *and* of persuading the jury of its existence." *Id.* at § 337 (emphasis added). Finally, we note that the measure of persuasion in civil cases is, generally, by a preponderance, or greater weight, of the evidence. *Id.* at § 339. In the instant case, the DOT moved for a directed verdict. While a burden of production is appropriate to *defeat* a directed verdict motion, *see id.* at § 336, it is simply illogical to apply the same burden to *grant* a directed verdict motion.

Moreover, given the standard a governmental entity must meet to establish discretionary immunity, we find that the burden of proof must be one of persuasion. In *Foster,* the

Court mandated that when a governmental entity was claiming discretionary immunity, it *"must show* that in weighing the competing considerations and alternatives, it utilized *accepted professional standards* appropriate to resolve the issue before them." *Foster,* 306 S.C. at 525, 413 S.E.2d at 35 (emphasis added). This standard is inherently factual. To allow the DOT to shield itself with only a showing of "some evidence" would eviscerate the standard enunciated by this Court. Certainly a governmental entity should not be entitled to discretionary immunity as a matter of law merely by creating an issue of fact.

■ We hold that when a governmental entity asserts the affirmative defense of discretionary immunity under the Tort Claims Act, the burden of proof is on the governmental entity and this burden is one of persuasion by a preponderance of the evidence.

Accordingly, the Court of Appeals correctly analyzed this issue in terms of whether a jury issue was presented. *See, e.g., Strange,* 314 S.C. at 429–30, 445 S.E.2d at 440 ("In ruling on motions for directed verdict and JNOV, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions and to deny the motions where either the evidence yields more than one inference or its inference is in doubt."). Because there was an issue of fact on whether: (1) the DOT's employees actually weighed competing considerations and made a conscious choice regarding the Chapman High School sign, and (2) the DOT established that in weighing competing considerations and alternatives, it utilized accepted professional standards, we find the trial court correctly denied the DOT's motions. Consequently, we affirm the Court of Appeals on this issue.

## 2. ADMISSIBILITY OF EVIDENCE OF PRIOR ACCIDENTS AT INTERSECTION AND LETTERS TO DOT ABOUT INTERSECTION

■ The DOT argues that the admission of evidence on 19 previous accidents which occurred at or near the intersection was prejudicial error because 18 of the 19 accidents were not similar to Melissa's accident. The DOT also argues that the trial court erroneously admitted letters written to the DOT about the intersection.

At trial, Respondent presented evidence to support his claim that the DOT negligently maintained the intersection by failing to install a traffic signal. The DOT's expert, Dr. Clark testified that The Manual on Uniform Traffic Control Devices has specific criteria known as "warrants." One of these warrants is whether "a minimum of five traffic accidents per year could be corrected by the installation of a signal." Thus, if five accidents in one year could be corrected by a traffic light, then this weighs in favor of installing a light. Thompson even stated that when reviewing accident history, the department looks for a pattern and therefore, it could take even less than five accidents a year to warrant installation of a traffic signal.

Thompson was asked about the 19 previous accidents and he explained that prior to Melissa's accident, only one accident occurred when a car turned left from Park Road onto Highway 176. Thompson testified that the other accidents which occurred at or near the intersection were not under similar circumstances.

Over objection, Respondent was also permitted to admit several letters from politicians and citizens. These letters expressed concern about the safety of the intersection and requested that either a traffic signal be installed or a feasibility study be conducted on whether a traffic signal was needed.[5] Thompson testified that in response to the letters, the DOT evaluated the intersection several times to determine whether a traffic signal should be installed. Based on the studies that were performed, the DOT recommended no traffic signal at the intersection.[6]

---

**5.** The letters from politicians noted traffic problems at the intersection of Highway 176 and Chapman High School and requested studies on the feasibility of a traffic light. Another letter was from the Bergs, parents of a Chapman High School student, who informed the DOT of the "terribly hazardous" traffic situation and requested an investigation and traffic light. The Bergs wrote that it would be "well worth the effort of an investigation to save a life." A letter from another citizen, Mrs. Rector, stated that "numerous accidents" had occurred at the intersection and asked for a traffic light to be installed "as quickly as possible."

**6.** The DOT determined that due to the intersection's location at the bottom of two downgrades, a traffic signal would potentially increase the danger of collision.

The DOT argues that the admission of both the prior accidents and the letters was prejudicial error. We disagree.

Evidence is relevant and admissible if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Rules 401, 402, SCRE. Relevant evidence may be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403, SCRE. It is well settled that the admission and rejection of testimony is largely within the trial court's sound discretion, the exercise of which will not be disturbed on appeal absent an abuse of that discretion. *E.g., Baber v. Greenville County*, 327 S.C. 31, 41, 488 S.E.2d 314, 319 (1997).

In our opinion, the evidence of the previous accidents and the letters was relevant to the issue of whether the DOT was negligent in failing to install a traffic signal at the intersection. Regarding the prior accidents, the evidence showed that more than five accidents occurred in 1990, and thus was specifically relevant to the warrant outlined in The Manual on Uniform Traffic Control Devices. Moreover, because the DOT's own engineer, Thompson, stated that even less than five accidents could signal a safety problem at an intersection, the evidence of the previous accidents was properly admitted. The letters, which requested either the installation of a traffic signal or an investigation on the feasibility of a signal, served to show that the DOT knew that the intersection was dangerous and potentially required a traffic light. Thus, the letters were clearly relevant on the issue of notice.

Accordingly, we hold that the trial court properly allowed this evidence to be admitted.

## 3. STATUTORY CAP ON DAMAGES

The DOT argues that the verdict in this case should have been reduced to $250,000 in accordance with the reenactment of the statutory cap. *See* 1997 S.C. Acts No. 155, § 55(C); S.C.Code Ann. 15–78–120(a)(1).[7] We disagree.

---

7. We note that under current law, the limitation on liability is $300,000. *See* S.C.Code Ann. 15–78–120(a)(1) (Supp.1999).

On appeal, the DOT argued that section 55(C) of the 1997 Appropriations Act reenacted the statutory cap and therefore, the verdict must be reduced. Section 55(F) states that "[e]xcept where otherwise provided, this section takes effect upon approval of the Governor and *applies to claims or actions pending on that date* or thereafter filed, *except where final judgment has been entered before that date.*" (Emphasis added). This section was approved by the Governor on June 14, 1997. The DOT argued that the statutory cap applied because the appeal was still pending as of June 14, 1997, and therefore the case was an action "pending on that date." The Court of Appeals, however, found that the words "final judgment" meant the verdict in the trial court. Since the verdict in this case was rendered on July 18, 1996, the Court of Appeals held that the 1997 reenactment of the statutory cap did not apply. *Pike,* 332 S.C. at 618–19, 506 S.E.2d at 523.

Subsequent to the Court of Appeals' decision, this Court faced the same issue in *Steinke v. South Carolina Dep't of Labor, Licensing and Regulation,* 336 S.C. 373, 520 S.E.2d 142 (1999). Based on the separation of powers doctrine, the *Steinke* Court held that the Legislature could not by retroactive amendment overrule this Court's prior precedent that the statutory cap does not apply to actions filed before July 1, 1994.[8] Because the action in *Steinke* had been filed on June 29, 1994, two days before the reinstatement of the limits on July 1, 1994, the Court held that the statutory cap did not apply. The instant action was filed on June 23, 1994. Pursuant to *Steinke,* the statutory cap simply does not apply. We

---

8. *See Southeastern Freight Lines v. City of Hartsville,* 313 S.C. 466, 443 S.E.2d 395 (1994) (where the Court held that the Legislature, by enacting inconsistent provisions in the Uniform Contribution Among Tort–Feasors Act, had impliedly repealed the statutory cap of the Tort Claims Act); *McClain v. South Carolina Dep't of Education,* 323 S.C. 132, 473 S.E.2d 799 (1996) (holding that the statutory limit in Tort Claims Act does not apply to cases filed before July 1, 1994, even when there are no joint tortfeasors with the governmental entity); *Knoke v. South Carolina Dep't of Parks, Recreation, and Tourism,* 324 S.C. 136, 478 S.E.2d 256 (1996) (holding that *Southeastern Freight Lines* and *McClain* apply to the $500,000 per occurrence cap, not just the $250,000 individual cap); *Wooten v. South Carolina Dep't of Transp.,* 326 S.C. 516, 485 S.E.2d 119 (Ct.App.1997) (determining the statutory limit was inapplicable in case filed before July 1, 1994), *aff'd as modified,* 333 S.C. 464, 511 S.E.2d 355 (1999).

therefore affirm the result reached by the Court of Appeals on this issue.

## CONCLUSION

We hold that a governmental entity has the burden of persuasion by a preponderance of the evidence when asserting discretionary immunity under the Tort Claims Act. Thus, because a jury issue was created, the Court of Appeals correctly affirmed the trial court's denial of the DOT's directed verdict and post-trial motions. We also hold that the trial court correctly admitted evidence of prior accidents at the intersection and letters to the DOT about the intersection. Finally, we hold that the statutory cap does not apply to this case based on the recent *Steinke* decision. The Court of Appeals' decision is

**AFFIRMED AS MODIFIED.**

TOAL, C.J., MOORE, BURNETT and PLEICONES, JJ., concur.