# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Cynthia Wright and Richard Wright, Appellants,

v.

South Carolina Department of Transportation, Pilot Travel Centers, LLC, Speedway LLC, Ashley Land Surveying, Inc., f/k/a Ashley Engineering & Consulting, Inc., and Munlake Contractors, Inc., Defendants,

Of which South Carolina Department of Transportation, Pilot Travel Centers, LLC, Speedway, LLC, Ashley Land Surveying, Inc. f/k/a Ashley Engineering and Consulting, Inc. are the Respondents.

Appellate Case No. 2017-001563

———————

Appeal From Berkeley County
Roger M. Young, Sr., Circuit Court Judge
Kristi Lea Harrington, Circuit Court Judge

———————

Opinion No. 5921
Heard May 27, 2020 – Filed July 6, 2022

———————

**AFFIRMED**

———————

S. Randall Hood and Jordan Christopher Calloway, both of McGowan Hood & Felder, LLC, of Rock Hill, Shawn Boyd Deery, of McGowan Hood & Felder, LLC, of Columbia, and Kevin B. Smith, of Hoffman Law Firm, of North Charleston; all for Appellants.

R. Davis Howser and Jeffrey Ian Silverberg, both of Howser Newman & Besley, LLC, of Columbia, for Respondent Pilot Travel Centers, LLC; Roy Pearce Maybank and Amanda R. Maybank, both of Maybank Law Firm, LLC, of Charleston, for Respondent South Carolina Department of Transportation; Jerome Bennett Crites, III and Mary Barnwell Ramsey, both of Shumaker Loop & Kendrick, LLP, of Charleston, for Respondent Speedway, LLC; and Bruce Alan Berlinsky, of Charleston, for Respondent Ashley Land Surveying, Inc.

**MCDONALD, J.:** Cynthia and Richard Wright appeal the circuit court's orders granting summary judgment to the South Carolina Department of Transportation (SCDOT), Pilot Travel Centers, Speedway, LLC, and Ashley Land Surveying (Ashley), arguing the circuit court erred in finding (1) the private entities did not owe a duty of care to the Wrights with respect to the design and placement of a highway median and the driveways constructed pursuant to an encroachment permit, (2) no question of fact existed as to proximate cause, and (3) the South Carolina Tort Claims Act barred their action against SCDOT. We affirm the orders of the circuit court.

**Facts and Procedural History**

In September 2000, SCDOT contacted Speedway regarding the acquisition of a 9,102 square foot right-of-way for a project redesigning the I-26 interchange next to Speedway's property on Highway 17-Alternative in Summerville. SCDOT acquired the right of way in November 2000. In September 2001, Pilot purchased the Speedway property, which contained an existing gas station, and redeveloped the property as a Pilot travel center. In May 2002, Pilot submitted an application for an encroachment permit to SCDOT in order to construct three access driveways for the new travel center. Ashley is an engineering firm Pilot retained to assist with obtaining the encroachment permit. At the time of SCDOT's approval of Pilot's application for the encroachment permit, no raised highway median prevented left turns into the property from the southbound lane of Highway 17A.[1]

---

[1] The original Speedway gas station on the property already had three driveways. These driveways were relocated as part of the Pilot rebuild. At no time prior to the Wrights' accident was there a non-traversable median at this location on Highway 17A.

Pilot began constructing the new travel center in August 2002. During this same time period, SCDOT was working on two projects in the area: the widening of Highway 17A in front of the travel center (Widening Project) and a separate project to redesign the I-26 interchange (Interchange Project) adjacent to it. SCDOT used its own engineers to design the plans for the Widening Project but hired an outside firm to design the Interchange Project. SCDOT completed the Widening Project on June 17, 2002, and the Interchange Project in November 2003.

On October 6, 2012, the Wrights were traveling on their motorcycle on Highway 17A near the I-26 overpass when a pickup truck driven by Daniel Sena turned left across their lane of travel directly into the Wrights' path. Sena was in the median attempting to turn left into the Pilot travel center when he collided with the Wrights' motorcycle and seriously injured them. Sena fled the scene of the accident and was later taken into custody, where he tested positive for cocaine and had a .12 blood alcohol level. Sena subsequently pled guilty to two counts of felony DUI, leaving the scene of an accident with great bodily injury, and possession of cocaine.

The Wrights filed an action for negligence and loss of consortium against SCDOT, Pilot, and C & A Unlimited, Inc., in Berkeley County, and an action against Marathon Petroleum Company, Ashley, and Munlake Contractors in Dorchester County.[2] They subsequently amended the Berkeley complaint to substitute Speedway as a party for Marathon Petroleum, and the two cases were consolidated in Berkeley County. Munlake Contractors failed to appear and was held in default.

The Honorable Roger Young granted Pilot's motion for summary judgment, finding the Wrights could not establish Pilot owed them a duty of care "as a landowner abutting the portion of the highway" where the Wrights were injured. The circuit court denied the Wrights' Rule 59(e), SCRCP, motion as well. The Honorable Kristi Harrington subsequently granted summary judgment to Speedway and Ashley by Form 4 order, finding no genuine issue of material fact existed as to the issues of duty and proximate cause for the Wrights' claims against these private defendants. The circuit court further found the claims against SCDOT were barred by Section 15-78-60 of the South Carolina Code, which sets forth the Tort Claims Act's exceptions to the waiver of governmental immunity.

**Standard of Review**

---

[2] Munlake was the general contractor for the Pilot travel center.

"In reviewing a grant of summary judgment, our appellate court applies the same standard as the trial court under Rule 56(c), SCRCP." *Woodson v. DLI Properties, LLC*, 406 S.C. 517, 528, 753 S.E.2d 428, 434 (2014). "In determining whether summary judgment is proper, the court must construe all ambiguities, conclusions, and inferences arising from the evidence against the moving party." *Weston v. Kim's Dollar Store*, 399 S.C. 303, 308, 731 S.E.2d 864, 866 (2012) (quoting *Byers v. Westinghouse Elec. Corp.*, 310 S.C. 5, 7, 425 S.E.2d 23, 24 (1992)).

**Law and Analysis**

**I. Pilot, Speedway, and Ashley**

**A. Duty of Care**

The Wrights contend the circuit court erred in finding Pilot, Speedway, and Ashley owed them no duty of care because these entities negotiated with SCDOT for the creation of a dangerous artificial condition—a non-raised, painted flush median in place of a safer raised concrete median—during the design of the Highway 17A Widening Project.[3] The Wrights allege Pilot breached its duty of care to travelers by seeking and obtaining the alteration of SCDOT's plan for a raised median, pursuing entrance driveways too close to an adjacent intersection, and failing to address problems with the nearby highway intersection despite notice of accidents there. We agree with the circuit court that under South Carolina law, the Wrights cannot establish the private entities owed them a duty of care for conditions on Highway 17A.

> In order to prove negligence, a plaintiff must show: (1) defendant owes a duty of care to the plaintiff; (2) defendant breached the duty by a negligent act or omission; (3) defendant's breach was the actual and proximate cause of the plaintiff's injury; and (4) plaintiff suffered an injury or damages.

*Doe v. Marion*, 373 S.C. 390, 400, 645 S.E.2d 245, 250 (2007). "In a negligence action, '[t]he court must determine, as a matter of law, whether the law recognizes a particular duty.'" *Repko v. Cnty. of Georgetown*, 424 S.C. 494, 500, 818 S.E.2d

---

[3] A flush median is an area in the middle of a roadway that can easily be traversed by a vehicle.

743, 747 (2018) (alteration in original) (quoting *Steinke v. S.C. Dep't of Lab., Licensing & Regul.*, 336 S.C. 373, 387, 520 S.E.2d 142, 149 (1999)). "Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law." *Cole v. Boy Scouts of Am.*, 397 S.C. 247, 251, 725 S.E.2d 476, 478 (2011). "Whether a duty exists is a question of law for the Court." *Skinner v. S.C. Dep't of Transp.*, 383 S.C. 520, 523, 681 S.E.2d 871, 873 (2009). "South Carolina common law only imposes a duty for highway conditions where an individual or business has undertaken an activity that creates an artificial condition on the highway which is dangerous to travelers." *Id.* at 524, 681 S.E.2d at 873. Examples of artificial conditions created by an abutting property owner might include materials spilled on a highway or smoke emissions that obstruct visibility. *See, e.g., id.* at 525, 681 S.E.2d at 874.

SCDOT engineers designed the plans for the Widening Project in 1998, and the outside design firm completed the plans for the Interchange Project in 1999. Leland Colvin is currently the SCDOT Director of Engineering, but he was previously the program manager for both the Widening Project and the Interchange Project. Colvin testified in his deposition that the outside firm's plans for the Interchange Project originally showed a raised median as a placeholder at this location on Highway 17A, but the plans SCDOT engineers designed for the Widening Project never included a raised median. When Colvin combined the two plans, he made the decision to utilize a flush median instead of a raised median in order to comply the SCDOT Highway Design Manual, which he considers the authority for highway design in South Carolina. Colvin testified he combined the plans so the Interchange Project plan would accurately reflect SCDOT's design for the Widening Project, and "the widening project always had that painted flush median."

The Wrights contend handwritten notes on an August 28, 2000 SCDOT letter to Marathon Petroleum support their claim that the circuit court erred in finding the private entities owed them no duty of care with respect to the dangerous condition, which they claim Pilot's predecessor negotiated during SCDOT's design and construction of the Highway 17A Widening Project. In this letter, SCDOT District Right of Way Manager Tommy Smoak wrote to a Marathon Petroleum representative, Robert Greiwe, referencing curb cuts and enclosing a copy of driveway drawings for the project. Handwritten notes Greiwe later made at the bottom of this letter state, "Per Phone Verification w/ T. Smoak (negotiated median removal & drive cuts)" and "Approved to have painted median only from far western curb cut to stop bar (stop light). In other words, the unmountable median has been eliminated from the plan." For the reasons discussed below, we agree

with the circuit court that despite these notations on the letter, the evidence in the record establishes the decision to implement a flush median as opposed to a raised median remained an SCDOT engineering decision, not the responsibility of the private entities.

Colvin testified that any statement that Pilot or Speedway "negotiated" the raised median out of the plans was inaccurate because the removal of a placeholder median (from the Interchange Plan, not the Widening Plan) was not due to any negotiation with or action by a private entity. He confirmed the plans for the Widening Project never contemplated a raised, non-traversable median. Colvin made the decision to use a flush median in his capacity as program manager, and from his perspective, "it was purely an engineering decision based on the Highway Design Manual, based on the difference of the two projects, the purpose and need." *See* S.C. Code Ann. § 15-78-60 (15) (2005) (recognizing SCDOT's initial discretion regarding the placement of highway median barriers). The Wrights have theorized that Pilot or Speedway may have negotiated with SCDOT for the non-raised flush median as part of SCDOT's right-of-way acquisition process. But evidence produced in discovery regarding SCDOT's purchase of the right-of-way for over two times the property's appraised value belies this theory, and the record contains no evidence of any "quid pro quo." Colvin did not recall ever speaking with any representative of the private parties regarding the decision to use a flush median, and he testified there simply was no such negotiation.

In addition to Colvin's testimony that it was SCDOT's decision to use a painted flush median in the Widening Project to address the needs of the combined plan, our supreme court's decision in *Skinner* further supports the circuit court's granting of summary judgment to the private entities. 383 S.C. at 525, 681 S.E.2d at 874. The Skinners were injured in an accident when their car was struck head on by a vehicle that veered onto the shoulder of the road near a stable driveway, overcorrected, and crossed over the centerline of the roadway. *Id.* at 522, 681 S.E.2d at 872. The Skinners sued the owners of the driveway and stable; however, the circuit court granted summary judgment, finding the property owners owed the Skinners no duty of care. *Id.* at 522, 681 S.E.2d at 872–73. On appeal, the Skinners argued traffic from horse trailers approaching the driveway caused ruts in the highway's shoulder, creating a dangerous condition of which the property owners had a duty to warn travelers along the highway. *Id.* at 523, 681 S.E.2d at 873. Our supreme court disagreed, finding the owners of property abutting a highway, who neither possess nor control the highway, owe no duty of care to travelers on the highway. *Id.* at 524, 681 S.E.2d at 874. The court recognized the ruts along the shoulder were "the natural consequences of highway use," and thus,

not artificial conditions giving rise to liability. *Id.* The court rejected the Skinners' argument that the owners of the driveway owed a duty of care to travelers due to their creation of the highway defect (in that the use of their driveway led to the ruts on the road shoulder). *Id.* at 525, 681 S.E.2d at 874. In finding the Skinners' reliance on SCDOT's ARMS[4] manual misplaced, the court held the SCDOT regulations were "inapplicable to respondents [the property owners] and are not a source of any duty. Moreover, they specifically impose the responsibility for maintaining rights-of-way, such as highway shoulders, on the Department." *Id.*[5]

For these reasons, the circuit court properly found the Wrights failed to establish any private entity owed them a duty of care because neither Pilot nor Speedway possessed or controlled the highway; possession and control of highways lies with SCDOT. *See id.* at 524–25, 681 S.E.2d at 874 ("We agree with the trial court that a contractor performing highway alterations owes a duty to travelers, but we find no analogous duty on the part of an owner of property abutting a highway who neither possesses nor controls the highway."). There is no evidence here that Pilot, Speedway, or Ashley created an artificial condition on Highway 17A. *See id.* at 523, 681 S.E.2d at 873 ("South Carolina common law only imposes a duty for highway conditions where an individual or business has undertaken an activity that creates an artificial condition on the highway which is dangerous to travelers.").

Even if SCDOT's installation of a flush median in lieu of a raised median could be construed as an artificial condition in the light most favorable to the Wrights, by statute SCDOT is exclusively responsible for highway design. *See* S.C. Code Ann. § 57-3-110 (2018) ("The Department of Transportation shall have the following duties and powers: (1) lay out, build, and maintain public highways and bridges, including the exclusive authority to establish design criteria, construction specifications, and standards required to construct and maintain highways and bridges; . . . (3) cause the state highways to be marked with appropriate directions

---

[4] SCDOT's Access and Roadside Management Standards (ARMS) manual provides guidelines to companies, developers, and private individuals seeking access to the state highway system. The South Carolina Highway Design Manual is a separate manual; both manuals provide mandatory rules, along with guidelines, as well as a process for seeking exceptions to these rules and guidelines.

[5] SCDOT's 30(b)(6) designee acknowledged in his deposition that SCDOT possesses and controls Highway 17A and is responsible for maintaining highways in a safe condition.

for travel and regulate the travel and traffic along such highways, subject to the laws of the State. . . ."); S.C. Code Ann. § 57-1-30 (2018) (stating SCDOT "shall have as its functions and purposes the systematic planning, construction, maintenance, and operation of the state highway system and the development of a statewide intermodal and freight system that is consistent with the needs and desires of the public"); S.C. Code Ann. § 15-78-60 (15) (2005) (recognizing SCDOT's initial discretion regarding the placement of highway median barriers).

As with the median selection, SCDOT was responsible for granting the encroachment permit and approving the design and placement of Pilot's driveways accessing Highway 17A.  To the extent the Wrights argue Pilot or Ashley created a dangerous condition in failing to request the encroachment permit and construct the driveways in a manner that would prevent access by travelers making left turns into the travel center from the opposite side of Highway 17A, we agree with the circuit court that this argument must fail.  Without more, the existence of permitted access driveways for ingress and egress to a business does not impose a duty upon a private property owner with respect to accidents that occur on the public highway.[6]

Colvin's deposition testimony supports this finding as well.  He explained that when SCDOT reviews encroachment permit applications, safety and the operation and functionality of the state highway system are the two primary concerns SCDOT considers in evaluating requests for access.  Safety considerations differ for interstate systems with no such access points, for urban arteries, minor arteries, and neighborhood streets.  Colvin elaborated, "[n]o roadway is treated the same with regards to the reasonable expectation of those drivers."

With respect to the Wrights' claim that the private entities failed to take remedial action to keep this area of Highway 17A in a safe condition or to warn travelers of the alleged dangerous condition, we have been unable to locate any South Carolina authority establishing a private property or business owner owes such a duty to warn or make safe a public highway.  Like the circuit court, we find the Pennsylvania case of *Allen v. Mellinger*, 625 A.2d 1326 (Pa. Commw. Ct. 1993),

---

[6] We find the Wrights' reliance upon the Georgia case of *Keith v. Beard*, 219 Ga. App. 190, 464 S.E.2d 633 (1995), is misplaced because the question in that case involved the property owner's violation of a commercial driveway permit requirement and an accident occurring when a motorist exited an *unpermitted* driveway.

helpful to our analysis. There, the plaintiff attempted to make a left turn into the parking lot of a meat market when she collided with a truck travelling in the opposite direction. *Id.* at 1327. The crest of a hill limited visibility for both drivers, and motorists in the area often exceeded the fifty-mile per hour speed limit. *Id*. Allen and her passenger sustained serious injuries; she sued the owners of the market, "alleging that they had breached a duty of care by failing to warn her of a dangerous condition." *Id*.

Relying upon the Restatement (Second) of Torts, § 349, the trial court granted the business owners' motion for summary judgment. *Id.* at 1328.[7] The Pennsylvania Commonwealth Court affirmed, noting state highways are the property of the Commonwealth, which "has the exclusive duty for the maintenance and repair of state highways." *Id*. Thus, any duty to maintain the highway or warn of a dangerous condition fell to the Commonwealth and not the abutting landowners. *Id*. The court also rejected Allen's argument that the business owners' "failure to erect signs, paint lines, or place curbing or barricades in the store parking lot, indicating where it was safe to turn, created a dangerous condition which led to her accident." *Id*. at 1329 n. 6.

Similarly, the private entities here owed no duty to warn or take other remedial action to address the safety of Highway 17A. As noted above, SCDOT is statutorily responsible for design, maintenance, and repair of the state highway system and for placement of appropriate signage. *See* § 57-3-110 ("The Department of Transportation shall have the following duties and powers: (1) lay out, build, and maintain public highways and bridges, including the exclusive authority to establish design criteria, construction specifications, and standards

---

[7] The Restatement (Second) of Torts, § 349, provides:

> A possessor of land over which there is a public highway or private right of way is not subject to liability for physical harm caused to travelers upon the highway or persons lawfully using the way by his failure to exercise reasonable care
> (a) to maintain the highway or way in safe condition for their use, or
> (b) to warn them of dangerous conditions in the way which, although not created by him, are known to him and which they neither know nor are likely to discover.

required to construct and maintain highways and bridges; . . . (3) cause the state highways to be marked with appropriate directions for travel and regulate the travel and traffic along such highways, subject to the laws of the State; . . .").

Accordingly, we find the circuit court properly declined to impose a duty of care upon a private "owner of property abutting a highway who neither possesses nor controls the highway." *See Skinner*, 383 S.C. at 524–25, 681 S.E.2d at 874; *see also Cole*, 397 S.C. at 251, 725 S.E.2d at 478 ("Absent a legally recognized duty, the defendant in a negligence action is entitled to a judgment as matter of law."). Thus, we affirm the orders granting summary judgment to the private entities.[8]

## II. SCDOT

As to SCDOT, the Wrights assert the circuit court erred in finding the Tort Claims Act barred recovery because SCDOT had constructive notice that the flush median allowing left turns into the Pilot travel center posed a risk of harm to motorists. The Wrights further argue that because SCDOT approved Pilot's encroachment permit in violation of its own policies and procedures, SCDOT is not entitled to discretionary or design immunity. Finally, the Wrights contend SCDOT was grossly negligent in failing to investigate and improve the intersection given the high rate of accidents in this area. We find the circuit court properly granted SCDOT summary judgment pursuant to the Tort Claims Act.

"The Tort Claims Act waives immunity for torts committed by the State, its political subdivisions, and governmental employees acting within the scope of their official duties." *Pike v. S.C. Dep't of Transp.*, 343 S.C. 224, 230, 540 S.E.2d 87, 90 (2000). The General Assembly has recognized it is "the public policy of the State of South Carolina that the State, and its political subdivisions, are only liable for torts within the limitations of this chapter and in accordance with the principles established herein." S.C. Code Ann. § 15-78-20(a) (2005). "The provisions of this chapter establishing limitations on and exemptions to the liability of the State, its political subdivisions, and employees, while acting within the scope of official duty, must be liberally construed in favor of limiting the liability of the State."

_____

[8] Because the disposition of the duty issue is dispositive, we decline to address the Wrights' proximate cause argument. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (explaining an appellate court need not address remaining issues when disposition of prior issue is dispositive).

S.C. Code Ann. § 15-78-20(f) (2005).  The Tort Claims Act subsection most applicable to the Wrights' claims regarding the choice of a flush median for the Highway 17A Widening Project states, in pertinent part:

> The governmental entity is not liable for a loss resulting from:
>
> (15) absence, condition, or malfunction of any sign, signal, warning device, illumination device, guardrail, or median barrier unless the absence, condition, or malfunction is not corrected by the governmental entity responsible for its maintenance within a reasonable time after actual or constructive notice.  Nothing in this item gives rise to liability arising from a failure of any governmental entity to initially place any of the above signs, signals, warning devices, guardrails, or median barriers when the failure is the result of a discretionary act of the governmental entity.  The signs, signals, warning devices, guardrails, or median barriers referred to in this item are those used in connection with hazards normally connected with the use of public ways and do not apply to the duty to warn of special conditions such as excavations, dredging, or public way construction.  Governmental entities are not liable for the design of highways and other public ways . . . .

S.C. Code Ann. § 15-78-60(15) (2005).

The Wrights presented SCDOT's 2008 ARMS manual as an exhibit at Colvin's deposition in seeking to establish SCDOT erred in designing and implementing a two-way left turn lane instead of a raised, non-traversable median.  The Wrights' counsel asked:

> Q: Is it true that nontraversable medians have the effect of a 35 percent reduction in traffic collisions?
>
> A: Yes.  I mean, Page on—on—Table 1.1, a continuous two-way left turn lane, TWLTL is our engineering term, has 35 percent reduction in total crashes, as a well as a

nontraversable median.  Both showed 35 percent
reduction in total crashes.

Q: All right.  So nontraversable medians, those would
have the effect of a 35 percent reduction in traffic
collisions?

A: Correct.

Q: Okay.  And so the absence of a nontraversable would
increase traffic collisions by 35 percent?

A: That is not what this table states.  This table—this
table states that continuous two-way left turn lane, which
is what we have—

Q: Okay.

A: —has—the effects on that has a 35 percent reduction
in total crashes,  30 percent decrease in delay, and a 30
percent increase in capacity.  The same increases and
decreases as a nontraversable median as noted in this
table.

Following this discussion, the Wrights questioned Colvin about statistics for
accidents involving left-turn collisions and the various options SCDOT might
consider in restricting left turn access from a highway into driveways and
businesses.  These options could include medians, guardrails, signs, and road
spikes.  In concluding this line of questioning, the Wrights asked:

Q: Okay.  And there was nothing that prohibited
[SCDOT] from incorporating their raised median plans
from the interchange improvement project.  Nothing
prohibited the DOT from going with the raised median
plan, did it?

A: It would have been outside of the Highway Design
Manual guidelines regarding this section of roadway and
where it stood—excuse me.

Q: Um-hum.

A: —and how this urban section of roadway with a
design speed less than 45 miles an hour, it would have
been in conflict with our Highway Design Manual.

Based on the evidence in the record, we agree with the circuit court that SCDOT is entitled to design immunity under the Tort Claims Act with respect to its decision to keep a two-way left turn lane at this location on Highway 17A when completing the Widening Project.

"[A]lthough SCDOT has design immunity, such immunity does not extend to maintenance issues after the DOT has notice of a hazardous condition." *Giannini v. S.C. Dep't of Transp.*, 378 S.C. 573, 580, 664 S.E.2d 450, 454 (2008). However, no evidence in this case suggests SCDOT had constructive notice of a hazardous condition at the intersection *prior to* the Wrights' accident.[9] Tragically, SCDOT became aware of the high rate of collisions along this busy stretch of Highway 17A after the Wrights' 2012 accident. SCDOT annually collects collision data through its access to the South Carolina Public Safety database—which shows the GPS location of traffic accidents—and SCDOT conducts annual safety analyses at those intersections with the highest accident rates as reported by SCDOT's traffic safety office. Colvin emphasized that collision rate triggers SCDOT's investigation into a location—not merely the number of accidents. Determining the collision rate in an area is a function of the total number of accidents and the respective annual traffic volume for the location.

In 2013, SCDOT conducted an accident analysis for the area of Highway 17A where the Pilot travel center is located because this was an intersection with one of the highest accident rates that particular year. There is no evidence in the record to suggest SCDOT knew or should have known of a high collision rate or otherwise potentially hazardous condition at the intersection prior to 2013.[10] Thus, the Wrights are unable to prevail on their theory that SCDOT was negligent in failing to investigate and correct conditions at the intersection prior to their accident.

---

[9] At oral argument, the Wrights agreed constructive, not actual, notice is the theory upon which they base their claims.

[10] SCDOT took corrective action on Highway 17A following its 2013 accident analysis in the area.

In *Giannini*, two plaintiffs were injured and one died after being struck by a hydroplaning Ford Expedition traveling north crossed a median into the southbound lanes of I-77. 378 S.C. at 578, 664 S.E.2d at 452. The plaintiffs alleged median barriers could have prevented the accident and SCDOT negligently failed to install the barriers in the area of the interstate where the accident occurred. *Id.* SCDOT claimed immunity under the Tort Claims Act and moved for a directed verdict, which the circuit court denied. *Id.* at 578, 664 S.E.2d at 452–53. Following a verdict for the plaintiffs, post-trial motions, and SCDOT's appeal, the supreme court found SCDOT had notice of the existing hazard on I-77 because there had been several crossover accidents within two miles of the *Giannini* accident, two people had died, and local media covered these accidents. *Id.* Thus, the circuit court properly denied SCDOT's directed verdict and JNOV motions on the issue of whether SCDOT breached a duty to the plaintiffs by failing to install median barriers on that stretch of I-77 after it received notice of crossover accidents in the area. *Id.* at 581, 664 S.E.2d at 454.

Prior to *Giannini*, the supreme court addressed section 15-78-60(15) in *Wooten ex rel. Wooten v. South Carolina Department of Transportation*, 333 S.C. 464, 468, 511 S.E.2d 355, 357 (1999). There, a twelve-year-old girl was injured when she was struck by a vehicle while crossing an intersection. *Id.* at 466, 511 S.E.2d at 356. The girl and her mother filed an action alleging SCDOT was negligent in failing to set traffic lights with sufficient time for a pedestrian to cross the intersection, failing to provide walk signals, and failing to warn pedestrians the intersection was hazardous. *Id.* at 466–67, 511 S.E.2d at 356–57. On appeal, this court held SCDOT was no longer immune from liability once it had notice that an intersection was hazardous. *Id.* The supreme court affirmed as modified, adopting the circuit court's reasoning that the immunity provision addressing signs and signals applied to the case, as opposed to the broader design immunity provision. *Id.* Thus, while the design immunity language of exception (15) was inapplicable in *Wooten*, the traffic signal portion of the exception providing discretionary immunity controlled.

The Tort Claims Acts further declares governmental entities are not liable for "the exercise of discretion or judgment by the governmental entity or employee or the performance or failure to perform any act or service which is in the discretion or judgment of the governmental entity or employee." S.C. Code Ann. § 15-78-60(5) (2005). "To establish discretionary immunity, the governmental entity must prove that the governmental employees, faced with alternatives, actually weighed competing considerations and made a conscious choice." *Pike*, 343 S.C. at 230, 540 S.E.2d at 90. "The governmental entity must show that in weighing the

competing considerations and alternatives, it utilized accepted professional standards appropriate to resolve the issue before them." *Id.* (quoting *Foster v. S.C. Dep't of Highways & Pub. Transp.*, 306 S.C. 519, 525, 413 S.E.2d 31, 35 (1992)).

Evidence in the record establishes SCDOT employees "weighed competing considerations and made a conscious choice" in granting the encroachment permit for the Pilot travel center. Colvin explained the ARMS manual provides a set of guidelines to be followed but also allows for exceptions to these guidelines. While he acknowledged one of Pilot's driveways was within the functional area of the intersection, which is generally "frowned upon" by the guidelines of the ARMS manual, he explained that in determining driveway locations, SCDOT considers a variety of factors.[11]

Robert Clark, District 6 Engineering Administrator for SCDOT, testified the ARMS manual is one of several resources SCDOT engineers use in considering an encroachment permit for highway access. SCDOT reviews traffic load at the particular location, including the location of any traffic backups, the lanes needed, and the turning maneuvers available at the intersection. Other factors reviewed include the environment of the intersection—such as speed, traffic signal control, and sight distance—considered in conjunction with the encroachment permit application. SCDOT then uses "engineering judgment to say, okay, this looks like this is in substantial conformity with—with what our rules are."

Clark further noted the distances in the ARMS manual are suggested guidelines because "you have to look at the site that you've got and what the—what the traffic is doing at the site, how it's circulating on the site, and bring all those factors together to make that determination." He admitted that allowing Pilot to have three driveways for its degree of frontage did not fall within the general guidelines of the ARMS manual but explained that for a particular business:

---

[11] Colvin defined the functional area of an intersection as "basically the turn lanes coming in and out of that intersection and the—the perception of that driver to be able to make those allowable turning movements in and out of that, in and out of that intersection." He testified that limiting or eliminating driveways within the functional area of an intersection is decided on a case-by-case basis. Moreover, certain exceptions to the ARMS manual applied to this location due to the driveways already in place prior to the Widening Project and the replacement of such access points.

Again, it depends on internal circulation as to what you want to do. You may have a one-way pair. Or, if you've got trucks, you don't want trucks and automobiles to mix. So you take that and then you look at site plan and look at what's being used on the site to make an engineering judgment as to what is appropriate.

Based on the foregoing, we find the evidence establishes SCDOT weighed the competing considerations applicable to both the use of the travel center site and this area of Highway 17A when granting the encroachment permit for the requested driveways. These considerations included the pertinent provisions of and exceptions to the guidelines set forth in the ARMS manual, as well as other engineering standards, traffic loads, and access needs of the site.[12] Therefore, the circuit court properly found the Wrights' claims against SCDOT regarding the encroachment permit were barred by the applicable provisions of the South Carolina Tort Claims Act.

**Conclusion**

---

[12] The affidavits of the Wrights' expert engineering witnesses do not raise the inferences necessary to achieve a different result. Both affidavits address industry standards *Pilot* allegedly ignored; they do not address the obligations and competing considerations SCDOT must address when providing private property owners access to a public roadway. For example, the affidavit of municipal and highway associate engineer Richard M. Balgowan speaks to what a "reasonably prudent company should do" and is at times inconsistent with our supreme court's holding in *Skinner*, *supra*, in stating "Pilot could have contacted SCDOT to implement a means to curtail the artificial condition and construct a safer form of ingress and egress to the facility" which disallowed left-hand turns. In referencing the encroachment permit request and categorizing the location of the driveways as an "artificial condition," Balgowan states in his opinion, "Pilot ignored industry standards and prioritized its own revenue over the safety of its customers and the general public." We find these statements regarding Pilot's actions and what it knew, should have known, or should have reported to SCDOT insufficient to overcome the Legislature's grant of immunity in the exceptions to governmental liability set forth in the plain language of the Tort Claims Act. *See e.g.*, S.C. Code Ann. § 15-78-60 (5), (15).

The circuit court's orders granting summary judgment are

**AFFIRMED**.

**THOMAS, J., and HUFF, A.J., concur.**